JOHN BAUMANN, Plaintiff-Appellant, *v.* LAWNDALE NATIONAL BANK OF CHICAGO *et al.*, Defendants-Appellees.

Second District (1st Division)   No. 76-104

Opinion filed January 21, 1977.

R. Terrance Kalina, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellant.

Mirabella, Facktor, Mirabella & Kincaid, of Wheaton, for appellees.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff sued to quiet title to land, the record title to which was in the Lawndale National Bank as trustee with the defendant Rose Marchese as beneficiary of the trust. Plaintiff's claim of ownership by adverse possession (Ill. Rev. Stat. 1973, ch. 83, par. 1 was denied in a bench trial and he appeals.[1]

An illustrative sketch prepared by this court based upon our reading of the record is shown for convenience:

---

[1] At trial defendants' counterclaim alleging that plaintiff had constructed a building which encroached about three inches on another lot owned by the defendants (Lot 20) was denied as insignificant. Defendants do not cross-appeal from that judgment nor from the ruling of the trial judge which held that plaintiff is entitled to use a septic field on defendants' land based on the theory of license.

The property which plaintiff claims by adverse possession is that portion of lot 2 which is located between the driveway and lot 3, and also the driveway.

Lots 2 and 3 were originally owned by Victor and Olga Schiller. On September 2, 1948, the Schillers entered into an agreement to sell lot 3 on an installment contract pursuant to which the lot was conveyed to the Williards on January 29, 1955. The Williards conveyed lot 3 to plaintiff and his wife on May 8, 1956. The legal description in the deed contained no description of the disputed land. The Schillers conveyed lot 2, together with other lots in Schillers' addition, to the Lawndale National Bank, as trustee under Trust No. 1621, on February 6, 1951. There was also testimony by the defendant Rose Marchese that she and her husband, now deceased, purchased lot 2 in 1951 taking title in the land trust.

Mrs. Vix, a daughter of the Williards, testified that she was 16 at the time her parents purchased lot 3 and that she lived on the property either in her parents' home or in an adjoining residence until she was 23. She said that the Williard family used a gravel driveway which ran across Schillers' lot with access to Plainfield Road. This was not a necessity, however, since lot 3 had direct access to Plainfield Road. She bought a horse from Schiller in 1944 and exercised it on the portion of lot 2 west of the gravel driveway until she sold the horse in 1954.

Mrs. Vix further testified that her father maintained the driveway and cut the grass on the disputed property up to the driveway. In 1948 her father installed a septic system which ran east from his lot 3 to a curve of the gravel driveway on Schillers' lot 2. She assumed that this was done with Schillers' permission but she did not have actual knowledge. The septic field was installed by the Williards on Schillers' property because it was the only reasonable location and not because the Williards were claiming ownership of the property.

Mrs. Vix also testified that in many discussions with the family her father referred to an understanding or agreement that they could use the driveway on the Schillers' property. However, Schiller was planning to build a retirement residence on the southeast corner of lot 2 and it was the understanding that when he built that home, the Williards would have to install their own driveway. She said that it was part of the understanding that her father also could use the grassy area between the driveway and the east lot line. She did not think that there was ever a discussion that her father would cut the grass in the grassy area, but that he cut it because it looked better and not to lay any claim to it. There were discussions in the family about the septic field. Her father was also concerned that he might have to install a new drive and that there would be a problem selling the property without the driveway. With reference to the time when Schiller owned lot 2 Mrs. Vix testified that he visited the lot almost every weekend staying in the summer cottage in the corner of the lot. She said that there

had not been any discussion as to using the horse on lot 2 but that Schiller enjoyed it so that he didn't mind having it on the property. She categorically stated that it was never the intent of anyone in her family to gain possession of the disputed property.

Mrs. Vix testified that she was present when her father told the plaintiff, Baumann, that the Schillers had allowed them to use the driveway but that the driveway was not part of the purchase. Mrs. Vix also stated that about a year before trial Baumann came to the bank where she worked and asked if the Williards had ever used the disputed property and what the agreement was. Mrs. Vix stated she made the agreement known to him and that Baumann acknowledged at the time that he did not own the disputed property.

Frank Marchese, the son of Rose and Frank, Sr., testified that the family used lot 2 as a picnic area from 1951 through 1955. In 1955 the elder Marcheses moved to Arcadia, California. Mrs. Marchese testified in an evidence deposition that when she and her husband acquired the property there was only a shack and a lot of trees on the property with no fences. She stated that her husband gave Mr. Williard permission "to use part of the lot." She stated that there was an "easement" in favor of Mr. Williard at the time of the purchase and she was unaware that Mr. Williard had sold the property.

Tax receipts admitted as evidence indicated that since the property was acquired in 1951 the defendants had paid the real estate taxes on all of lot 2.

Martin Cosentino, Mrs. Marchese's brother, testified that from 1951 to 1955 or 1956 that he and his brother and sisters would have picnics on lot 2; would visit the property at least once a week often storing items in the abandoned real estate office; and parking their cars in the disputed driveway and on Plainfield Road. Cosentino said that on occasion he would talk to Williard and Mr. Williard would loan him his lawn mower to cut the grass in the picnic area. In the course of these conversations he testified that Williard stated that he was just using the driveway and that it belonged to lot 2. Cosentino stated that at this time a fence made of tree logs was located along the easterly side of the driveway and continued past lot 20, except for an open portion where the barbecue pit was located.

The plaintiff John Baumann testified that after he purchased lot 3 from the Williards he lived on lot 3 from 1956 until 1972 and now rents the property to tenants. With reference to the portion of lot 2 in dispute he said he put a number of loads of black dirt on it and "stoned" the driveway. He said there were no fences on the property when he purchased it but that in 1957 he put up a fence directly east of the driveway. Later, in 1965, he fenced the west portion and created an outdoor riding ring. He said he had used the disputed section to graze his

horses since 1957. He had installed wiring along the fences and a floodlight to illuminate the riding ring. Frequently he would ride the horses in the ring and his tenants presently use it. He also installed a two-car gravel parking space in the north portion of the disputed land in 1965 and he rerouted the septic field extending it southward into the center of the disputed property.

He acknowledged that he had never received permission to perform any of these activities. He said he was unclear at the time of the purchase about the exact dimensions of his lot. He testified that he was never aware of any agreement with respect to the driveway and that Mrs. Vix had never told him of any agreement. However, during cross-examination Baumann admitted that Mrs. Vix had told him that there was some agreement to use the driveway. Baumann testified that Williard told him that he never had trouble using the driveway and that he did not expect Baumann to have trouble. As a result, Baumann stated, he just continued to use it.

Plaintiff contends that on this record he has proved adverse possession of the disputed land and that the trial judge's ruling that the defendant trustee was vested with fee simple title to all of lot 2 is against the manifest weight of the evidence.

■■ Under section 1 of the Limitations Act (Ill. Rev. Stat. 1973, ch. 83, par. 1) upon which plaintiff's claim is based he was required to prove that he and his predecessors in title were "seized and possessed" of the disputed real property for a period of 20 years. The possession referred to in the statute must be "(1) hostile or adverse, (2) actual, (3) visible, notorious and exclusive, (4) continuous, and (5) under claim of ownership." (*Cagle v. Valter*, 20 Ill. 2d 589, 591-92 (1960).) The proof of record ownership affords the presumption that the title is valid "and that possession of the real estate is subservient to the rights of the owner of the record title." (*Walter v. Jones*, 15 Ill. 2d 220, 224 (1958).) The proof necessary to overcome the presumption, "must be strict, clear and unequivocal." (*Cagle v. Valter*, 20 Ill. 2d 589, 592. See also *Walter v. Jones*, 15 Ill. 2d 220, 224-25.) Where the original possession is permissive and consistent with the title of the record owner it will not become adverse until the party in possession has repudiated the permissive character of the occupation by acts which clearly indicate he claims title. *Walter v. Jones*, 15 Ill. 2d 220, 225.

In this case it is not disputed that the record title to the property in question is in the defendant as trustee. It is also apparent that the use of the property by plaintiff's predecessors in title, the Williards, at all times when the Schillers owned lot 2 was with Schillers' permission and was not adverse to or inconsistent with Schillers' ownership.

■■ Plaintiff argues that his acts and those of his predecessor while in

possession clearly and visibly indicated a claim of title. He cannot, however, avoid the effect of the disclaimer of ownership by the Williards and the admission of their permissive use since he was required to prove that the possession of the disputed property was without recognition of the superior title in a true owner. (See *Clavey v. Bobzien*, 6 Ill. 2d 549, 558 (1955).) Statements recognizing title in the record holder constitute evidence on the question whether the limitation statute has begun to run although such evidence is not necessarily conclusive proof of permissive occupancy in all circumstances. See *Jones v. Scott*, 314 Ill. 118, 126 (1924); *Carroll v. Rabberman*, 240 Ill. 450, 452 (1909).

In addition to the express disclaimers by the Williards that they claimed no rights in the disputed property, the fact that they did not describe any part of lot 2 when they conveyed it to the plaintiff is a significant indication the Williards were not claiming any rights against the record owner of the disputed land. *Loverkamp v. Loverkamp*, 381 Ill. 467, 474 (1942).

■■ In the circumstances of this case which included the evidence that the Williards stated that they did not claim ownership of the driveway nor of the portion of the property west of the driveway in question the trial judge could properly conclude that the Williards' use of lot 2 was permissive from 1954 through 1956. Plaintiff entered in possession in April of 1956 and filed his action in September of 1974 so that of necessity he must rely on over a year of adverse possession in the Williards in addition to the 18 years of his claimed adverse possession. This he was unable to do under the evidence.

■■ Even if it were assumed, contrary to our view of the record, that the possession of the Williards was adverse, we would have to consider the additional fact there was no evidence the Williards ever transferred their claim to the disputed portion of the land to the plaintiff. It was not included in the deed from the Williards to the plaintiff, an indication that the Williards were not attempting to pass any claim of ownership to the plaintiff as previously indicated. (See *Loverkamp v. Loverkamp*, 381 Ill. 467, 474.) Nor do we find any other evidence in the record which would show that the Williards intended to transfer their right or claim to the disputed property to the plaintiff. Claimants by adverse possession cannot rely upon a possession of their grantor without some proof that the disputed land was intended to be transferred. See *Duck Island Hunting & Fishing Club v. Whitnah*, 306 Ill. 284, 290-91 (1922).

We find the judgment of the trial court to be fully supported by the evidence and therefore affirm.

Affirmed.

RECHENMACHER, P. J., and GUILD, J., concur.